# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TACOMA BORDEN and ATTALIA BORDEN, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-19-551 |
| | § | |
| FORT BEND COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion to dismiss, or alternatively motion for more definite statement filed by defendants Fort Bend County (the "County"), Sheriff Troy E. Nehls, Deputy Sheriff Lieutenant J. Kovar, Deputy Sheriff J. Garza, Deputy Sheriff D. Youngblood, Deputy Sheriff D. Edwards, Deputy Sheriff T. James, Deputy Sheriff T. Garriques, Deputy Sheriff B. Ganey, Deputy Sheriff W. Conger, Deputy Sheriff M. Graham, Deputy Sheriff M. Pedone, Deputy Sheriff F. Bain, Deputy Sheriff K. Guidry-August, and Deputy Sheriff S. Holman (collectively, the "FBC Defendants"). Dkt. 13. After reviewing the motion, response,[1] and applicable law, the court is of the opinion that the motion should be GRANTED IN PART AND DENIED IN PART.

---

[1] The Bordens' response date was September 18, 2019, but they did not file their response until October 9. The court will nevertheless consider the response. Additionally, the Bordens contend that the motion to dismiss is untimely, *see* Dkt. 22 at 2, but it was filed thirteen days after the court granted leave to file an amended complaint and was within the deadline for dispositive motions in the scheduling order. *See* Dkt. 11 (allowing amendment, filed Aug. 15, 2019); Dkt. 12 (scheduling order setting dispositive motion deadline on December 27, 2019); Dkt. 13 (renewed motion to dismiss, filed on August 28, 2019). Thus, to the extent that the Bordens object to the motion being untimely, the objection is OVERRULED.

# I. BACKGROUND

This case involves alleged Constitutional violations associated with Tacoma Borden's time as an inmate in the Fort Bend County Jail, alleged discrimination against Tacoma Borden under the Americans with Disabilities Act ("ADA"), and loss of consortium allegedly suffered by Attalia Borden, Tacoma Borden's spouse. Dkt. 7. The Bordens contend that Tacoma Borden, who has epilepsy and suffers from severe seizures, received sub-standard medical care while she was an inmate at Fort Bend County Jail and was delayed or denied prescriptions that were needed for an obvious serious medical condition. *Id.* The Bordens contend that Tacoma Borden must take prescription medication daily to manage her condition or risk stroke, heart attack, paralysis, or death. *Id.* The Bordens assert that when Tacoma Borden was arrested, she informed employees at the jail when she was being processed that she needed to take 1000 mg of Keppra twice a day to control her severe epilepsy. *Id.* She also placed a request for the medication from the jail pharmacy and warned that she was at imminent risk of having a seizure if she did not receive the medication. *Id.* Additionally, her husband, Attalia Borden, allegedly went to the jail to inform them about Tacoma Borden's medical condition and was told by multiple employees that he was not allowed to bring her medicine. *Id.*

Tacoma Borden alleges that she did not receive the essential medication as requested and consequently had three seizures while in custody in the County, resulting in substantial injuries. *Id.* The Bordens contend that jail personnel falsified records about her seizures and health and that she was forced to sleep in soiled clothing and even had to go to court in blood and urine soiled clothing. *Id.* The Bordens also contend that officers at the jail retaliated against Tacoma Borden for complaining by, among other things, not providing clean underwear and sanitary napkins, not allowing her to shower, and denying her commissary privileges or access to the phone. *Id.*

Eventually, Tacoma Borden was transferred to Harris County jail, where she alleges she had a fourth seizure and then learned that she was suffering from Todd Paralysis and had to be taken to a hospital. *Id.* When she checked herself out of the hospital two days later, she contends that she could not walk and was paralyzed from mid-thigh to her feet. *Id.* She went back to Harris County jail, had to appear in court again for speeding tickets and failure to appear, and her incarceration was extended. *Id.* According to the amended complaint, she learned upon her eventual release that she had sprained both her neck and knee during her seizures. *Id.*

The Bordens contend that the defendants were deliberately indifferent to Tacoma Borden's medical needs and that, as a result, she languished in pain and blood and urine soaked clothing for several days, and was forced to appear in court in this same clothing. *Id.* The Bordens argue that the County has maintained policies and practices of prioritizing its profits by inadequately staffing the jail to handle medical emergencies. *Id.* The Bordens assert that inmates in the Fort Bend County Jail are denied their prescribed medications, or experience significant delay, and the County refrains from transporting inmates to the hospital. *Id.* The Bordens contend that the County does not provide training to its employees regarding treatment of individuals with preexisting medical conditions and routinely refuses to provide necessary medication. *Id.* They also contend that the County's policies and failure to train and supervise caused Tacoma Borden to have to serve time for traffic violations consecutively instead of concurrently, which resulted in her having to spend two extra days in jail. *Id.*

The Bordens allege that since Tacoma Borden's release, she and her family have been subjected to harassment and retaliation, including an officer making multiple random stops by their house and following Attalia Borden into a private parking lot to detain him in order to verify his handicap status because he parked in a handicap space. *Id.*

The FBC Defendants now move for dismissal of the Bordens' claims, arguing that (1) the Bordens' claims invoking the Fifth Amendment fail to state a claim against the FBC Defendants; (2) the FBC Defendants' qualified immunity defense defeats the claims as alleged; (3) the Bordens' claims under 42 U.S.C. § 1983 against Nehls, Kovar, and the County are insufficient to hold them liable for the alleged acts or omissions of others; (4) the Bordens fail to adequately plead an unconstitutional policy or custom approved by an authorized policymaker that was the moving force behind any constitutional violation by the FBC Defendants; (5) the Bordens fail to state a claim under the ADA based on intentional discrimination or failure to accommodate; (6) governmental immunity bars the Bordens' state law claims against the FBC Defendants; and (7) punitive damages are not recoverable against the County. Dkt. 13. The move, in the alternative, for a more definite statement under Federal Rule of Civil Procedure 12(e). *Id.*

The Bordens argue that the "motion to dismiss for failure to state a claim and for more definite statement carelessly characterizes [their amended] complaint as facially deficient of relief-worthy factual allegations." Dkt. 22. They assert that the complaint adequately alleges that the defendants unreasonably violated a clearly established constitutional right and were deliberately indifferent when doing so. *Id.* Specifically, they contend the defendants violated Tacoma Borden's clearly established right to be provided reasonable medical care and that their conduct was objectively unreasonable in light of clearly established law. *Id.* The Bordens also argue that they allege sufficient facts in the complaint to establish liability against Nehls and Kovar for unconstitutional conditions of confinement because Nehls and Kovar are liable as policymakers who implemented facially unconstitutional policies. *Id.* The Bordens additionally argue that they have alleged sufficient facts to establish a claim for disability discrimination under the ADA. *Id.* And

the contend that the FBC Defendants' motion for a more definite statement is "a surreptitious attempt to force [them] to plead to a heightened pleading standard." *Id.*

The FBC Defendants did not file a reply.

The FBC Defendants' motion to dismiss is now ripe for disposition.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65 (2007). In considering a Rule 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The supporting facts must be plausible—enough to raise a reasonable expectation that discovery will reveal further supporting evidence. *Id.* at 556.

### B. Motion for a More Definite Statement

"A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). However, motions for more definite statement are "generally

5

disfavored." *Lehman Bros. Holdings, Inc. v. Cornerstone Mortg. Co.,* No. H-09-0672, 2009 WL 1504977, at *1 (S.D. Tex. May 28, 2009) (Rosenthal, J.) (collecting authorities). "When a defendant is complaining of matters that can be clarified and developed during discovery, not matters that impede his ability to form a responsive pleading, an order directing the plaintiff to provide a more definite statement is not warranted." *Id.*

### III. ANALYSIS-MOTION TO DISMISS

The court will first consider the motion to dismiss the Fifth Amendment claims. It will then turn to the qualified immunity defenses and determine whether the amended complaint contains sufficient allegations to overcome the invocation of qualified immunity for the § 1983 claims. Third, the court will consider whether there are sufficient allegations to state a claim under the ADA. And, finally, the court will determine whether the Bordens plausibly state claims under Texas law and whether they may request punitive damages for the claims they have alleged.

### A. Fifth Amendment Claims

The Bordens contend that the FBC Defendants deprived Tacoma Borden of her clearly established rights under both the Fifth and Fourteenth Amendments to the U.S. Constitution. Dkt. 7. The FBC Defendants move to dismiss the Fifth Amendment claims, arguing that they should be dismissed because claims under the Fifth Amendment are only cognizable against the Federal Government. Dkt. 13. The Bordens do not address the Fifth Amendment claims in their response. *See* Dkt. 22.

The Fifth Amendment applies only to violations of constitutional rights by the United States or federal actors, and there are no allegations in the first amended complaint that the FBC Defendants were acting under the authority of the federal government. *See Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) (upholding summary judgment on Fifth Amendment claims

because there were no allegations officials were "acting under authority of the federal government").

Accordingly, the FBC Defendants' motion to dismiss the Fifth Amendment claims is GRANTED.

**B.     Qualified Immunity**

Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

The Bordens assert various § 1983 claims. Dkt. 7. They allege that each defendant violated Tacoma Borden's right to be free from cruel and unusual punishment under the Eighth Amendment, to the extent it is applicable through the Due Process Clause of the Fourteenth Amendment. *Id.* They also contend that the County and Nehls, Kovar, Garza, Youngblood, Edwards, James, Garriques, Ganey, Conger, Graham, Pedone, Bain, Guidry-August, and Holman (collectively, the "Individual FBC Defendants"), in their individual capacities, failed to provide medical attention with deliberate indifference and that the Individual FBC Defendants (1) failed to adopt policies regarding medical care for inmates with an imminent risk of a medical emergency; (2) failed to adopt policies regarding the provision of medical care and basic needs of inmates with medical conditions that affect continence; and (3) failed to adopt adequate hiring, training, and supervision policies regarding treatment, handling, and accommodations for inmates with preexisting conditions, including those causing incontinence. *Id.* And, they assert that the defendants caused Tacoma Borden's sentences

to run consecutively instead of concurrently, which they argue was an unreasonable seizure and double jeopardy. *Id.*

The FBC Defendants invoke qualified immunity and argue that the § 1983 claims asserted against the Individual FBC Defendants should be dismissed because the Bordens do not allege sufficient facts to overcome the Individual FBC Defendants' qualified immunity and have not alleged sufficient facts to establish a violation of Constitutional rights by each of the Individual FBC Defendants. Dkt. 13.

In a lawsuit brought against an individual defendant in his or her personal capacity, "'it is enough to show that the official, acting under the color of state law, caused the deprivation of a federal right.'" *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009). The official may assert qualified immunity, which "shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known.'" *Id.* at 395 (quoting *Wallace v. Cty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005)). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). At the motion to dismiss stage, the court must evaluate the conduct as alleged in the complaint for objective legal reasonableness. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834 (1996)). Courts must determine (1) if the plaintiff alleged a violation of a clearly established constitutional right, and (2) whether the alleged conduct was objectively reasonable under clearly established law that existed at the time of the incident. *Id.* Judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808 (2009).

"The constitutional rights of a pretrial detainee are found in the procedural and substantive due process guarantees of the Fourteenth Amendment." *Estate of Henson v. Wichita Cty.*, 795 F.3d 456, 462 (5th Cir. 2015). "The Fourteenth Amendment requires that state officials not disregard the 'basic human needs of pretrial detainees, including medical care.'" *Estate of Henson v. Krajca*, 440 F. App'x 341, 343 (5th Cir. 2011) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc)); *se also Estate of Henson*, 795 F.3d at 462 (quoting this language from *Krajca*). "[T]he substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee." *Id.* In the Fifth Circuit, the court's analysis depends on whether a plaintiff is alleging an episodic act or omission of an individual state official or the constitutionality of the conditions of confinement. *Estate of Henson*, 795 F.3d at 462. "A challenge to a condition of confinement is a challenge to 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Id.* at 463 (quoting *Hare*, 74 F.3d at 644). "An episodic-acts-or-omissions claim, by contrast, 'faults specific jail officials for their acts or omissions.'" *Id.* (quoting *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009)). "[T]here is no rule barring a plaintiff from pleading both alternative theories, and a court may properly evaluate each separately." *Id.* at 464.

Courts apply the test found in *Bell v. Wolfish* in conditions-of-confinement cases. *Id.* at 463. The question under *Bell v. Wolfish* is "whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861 (1979). The court must therefore determine "whether the [conditions or restrictions were] imposed for the purpose of punishment or whether [they were] but incident to some other legitimate governmental purpose." *Id.* at 538. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. If the condition is instead "arbitrary or purposeless," a court may infer that it is "punishment that may not

constitutionally be inflicted upon detainees *qua* detainees." *Id.* Thus, the plaintiff does not have to demonstrate that the state actor or municipality acted with intent to punish. *Estate of Henson*, 795 F.3d at 463. In determining whether an interest is legitimate, courts must keep in mind that the government's interests include not only its need to insure the detainee's presence at trial but also its legitimate interests in managing the facility. *Id.* at 540. Sometimes challenged conditions are explicit, and sometimes they reflect a *de facto* policy. *Estate of Henson*, 795 F.3d at 463.

In episodic-acts-or-omissions claims, the plaintiff points to specific jail officials for their acts or omissions. *Id.* The plaintiff complains first of a certain act or omission and then "'derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.'" *Id.* (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)). Intentionality is not presumed for episodic-acts-or-omissions claims, and a jail official violates the pretrial detainees constitutional rights "when the official had 'subjective knowledge of a substantial risk of serious harm' to the detainee and responded to that risk with deliberate indifference." *Id.* at 464 (quoting *Hare*, 74 F.3d at 650). "In other words, the state official must know of and disregard an excessive risk to inmate health and safety." *Id.*

In *Scott v. Moore*, the Fifth Circuit distinguished between conditions-of-confinement and episodic-acts-and-omissions cases by noting that in conditions-of-confinement cases the detainee complains of a "general condition of confinement," where it is generally the conditions themselves that constitute the harm, "for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." 114 F.3d at 53. In contrast, in acts-or-omissions cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or

omission." *Id.* In *Scott*, the Fifth Circuit determined that the facts, which included an allegation of sexual assaults due to inadequate staffing, bore a "closer resemblance to cases regarding episodic acts by prison employees." *Id.* Similarly, in *In re Estate of Henson*, the Fifth Circuit determined that claims against a physician in charge of the jail who the plaintiffs claimed acted with deliberate indifference in failing to provide appropriate medical evaluation or transport the detainee, who ended up dying in custody, were "properly characterized . . . as attacking episodic acts or omissions rather than conditions of [the detainee's] confinement." 795 F.3d at 464–65. Conversely, it treated the claims that the county did not have adequate facilities, equipment, or trained staff to treat detainees who had serious illnesses as a conditions-of-confinement claim. *Id.* at 466–67.

The Bordens' first amended complaint appears to assert both types of claims. *See generally* Dkt. 7. The FBC Defendants contend that the first amended complaint lacks any factual allegations of each defendant's awareness that Tacoma Borden would face a substantial risk of serious harm as a result of her health risk. Dkt. 13. They assert that the allegations in the complaint are conclusory, do not provide a causal nexus, and do not state a plausible claim for deliberate indifference. *Id.* They contend that the allegations that the defendants disregarded a substantial risk of serious harm by failing to take reasonable measures to provide Tacoma Borden with needed medication and that each defendant was aware of Tacoma Borden's medical condition and demonstrated a wanton disregard to her serious medical needs does not demonstrate that each of the Individual FBC Defendants acted with deliberate indifference because separate facts need to be alleged for each defendant. *Id.* (citing *Schultea v. Wood*, 47 F.3d 1427, 1430 (5th Cir. 1995)).

The Bordens assert that they specifically pled that (1) Guidry-August blatantly ignored Tacoma Borden's request for medical attention while looking directly at her; (2) Edwards outright denied Tacoma Borden's request for medical attention after being notified of her second seizure; and

(3) Tacoma Borden was not allowed to see Fort Bend medical personnel until after her third seizure and was not transported to a medical facility at that point even though her health deteriorated to a point where she was unable to walk. Dkt. 22. The Bordens further argue that they pled that each Individual FBC Defendant knew Tacoma Borden was at serious risk of harm if she did not get her medication and that they each recklessly disregarded the risk by failing to take any reasonably adequate measure to provide her with medication and sufficient medical care. *Id.*

Courts must examine each defendant's actions or alleged actions individually in the qualified immunity context. *Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007).

### 1. Garza.

The Bordens contend that Garza was the supervisor for the jail's medical department but was not there when Tacoma Borden asked to speak to the supervisor. *Id.* The Bordens also name Garza as a policymaker. *Id.* They contend that Garza "was personally involved in the inhumane and unsanitary conditions of confinement and denial and delay of medical care and treatment of Tacoma Thompson-Borden." *Id.* These allegations could be construed as either type of claim, and the court finds that if it is treated as a conditions-of-confinement claim, the allegations that Garza was personally involved in the conditions, including a denial of medical care and treatment, sufficiently allege the violation of a clearly defined constitutional right that was not objectively reasonable under clearly defined law that existed at the time. Thus, the motion to dismiss the § 1983 claims against Garza based on qualified immunity is DENIED.

### 2. Youngblood.

The Bordens contend that Tacoma Borden made a complaint to Youngblood, who met with Tacoma Borden in response to her "incessant requests to speak to a supervisor." *Id.* She allegedly filed a grievance to Youngblood, who then allegedly addressed one of the employees she complained

about in her presence thus revealing her identity and "causing her great discomfort and fear of retaliation." *Id.* The Bordens contends that Youngblood assured Tacoma Borden that she would receive her medication, but she did not. She had another seizure and filed another grievance against a guard, and she contends that Youngblood was not contacted until another prisoner complained of her foul odor. *Id.* This appears to be an episodic-acts-or-omissions claim, and the Bordens have sufficiently asserted that Youngblood knew of and disregarded an excessive risk to Tacoma Borden's health or safety. The Bordens thus sufficiently allege the violation of a clearly defined constitutional right that was not objectively reasonable under clearly defined law that existed at the time. The motion to dismiss the § 1983 claims against Youngblood is DENIED.

### 3. Edwards.

The Bordens contend that Edwards was personally involved in the inhumane and unsanitary conditions of confinement and denial and delay of the medical care and treatment of Tacoma Borden. *Id.* The Bordens assert that Tacoma Borden asked Edwards to provide her with clean clothes and to call medical personnel after her second seizure and also explained that she needed a new undergarment and sanitary supplies because she was menstruating, and Edwards allegedly responded, "'I'm so sick of y'all asking me to do sh\*\*. That's what that the kiosk is for. That ain't in my job description, stop asking me.'" *Id.* These allegations could be construed as either type of claim, but the court finds that they constitutes sufficient facts that, if taken as true, indicate that Edwards knew of and disregarded an excessive risk to Tacoma Borden's health or safety. The Bordens thus sufficiently allege the violation of a clearly defined constitutional right that was not objectively reasonable under clearly defined law that existed at the time. The motion to dismiss the § 1983 claims against Edwards is DENIED.

### 4. James.

The Bordens contend that James was personally involved in the harassment and retaliation against the Bordens. *Id.* Specifically, James has allegedly made multiple random stops by the Bordens' house and is the officer who allegedly followed Attalia Borden to a parking lot to inquire about his handicap status. *Id.* The Bordens also assert that James told her neighbors about Tacoma Borden's arrest and incarceration and wrongfully arrested her. *Id.* This is not a claim related to Borden's detention, and the Bordens do not provide any argument or caselaw regarding the allegations and legal theory of liability for James in response to the motion to dismiss. While certainly the Bordens provide specific facts about what James did, they have not shown how it is a violation of a clearly established Constitutional right and have thus not met their burden to overcome James's invocation of qualified immunity. Accordingly, the motion to dismiss the § 1983 claims against James is GRANTED.

### 5. Garriques, Ganey, Graham, Conger, Pedone, Bain, Guidry-August, and Holman.

The Bordens contend that Garriques, Ganey, Graham, Pedone, Bain, and all other Deputies "at one point in time—instructed [Tacoma Borden] to take a shower" despite refusing to provide her with new undergarments or sanitary napkins. Dkt. 7. The Bordens assert that this "suggestion [was] unreasonable, cruel and indicative of not only their individual deliberate indifference to Mrs. Borden's condition, but the culture of indifference and widespread disregard of the constitutional rights and privileges of inmates that permeates throughout the jail." *Id.* The Bordens contend that it was obvious that Tacoma Borden would not want to shower without clean undergarments and sanitary napkins given her hygienic and medical state. *Id.* She also contends that Ganey and Conger were supervisors who were personally involved in the inhumane and unsanitary conditions of confinement and delay or denial of medical care and that Graham, Pedone, Bain, Guidry-August, and

14

Holman were all personally involved in the inhumane and unsanitary conditions of confinement and delay or denial of medical care. The Bordens additionally contend that Bain told Tacoma Borden that she would have to be in the disciplinary tank as long as she had to use a wheelchair, thus, according the Bordens, "punishing Mrs. Borden for her disability and/or in retaliation due to Borden's remarking on their malfeasance." *Id.* With the exception of the claim about being told to take a shower when she did not have clean undergarments, these are mostly conditions-of-confinement-type claims. While the court does not necessarily believe being told to take a shower without being provided clean undergarments and needed sanitary supplies is a constitutional violation, withholding clean undergarments and sanitary supplies for days on end when an inmate is menstruating and suffers from a medical condition causing incontinence is. The court finds that the Bordens' contentions with regard to her conditions of confinement, and particularly the allegation that the deputies refused to provide Tacoma Borden with clean undergarments and sanitary supplies for days when she was menstruating and after she had seizures and had urinated on her clothing, is sufficient to state a claim that these defendants knew of and disregarded an excessive risk to Borden's health and safety.[2] Additionally, there are sufficient allegations of Garriques's, Ganey's,

---

[2] *See, e.g.*, *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir.2003) ("[T]his court and other circuits have recognized that deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement."); *Newman v. State of Ala.*, 559 F.2d 283, 291 (5th Cir. 1977) ("If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight."), *reversed in part on Eleventh Amendment grounds, Alabama v. Pugh*, 438 U.S. 781, 98 S. Ct. 3057 (1978); *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) (finding that summary judgment was not appropriate when an officer admitted to not providing a detainee who had "'blood all over her legs'" with a sanitary napkin); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1289 (S.D. W.Va. 1981) ("The failure to regularly provide prisoners with clean bedding, towels, clothing and sanitary mattresses, as well as toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions."). *But see Brown v. Hamilton, Twp. Police Dep't Mercer Cty., N.J.*, 547 F. App'x 96, 98 (3d Cir. 2013) (unpublished) ("[D]efendants' failure to provide needed sanitary napkins for a few

Graham's, Conger's, Pedone's, Bain's, Guidry-August's, and Holman's actions, at this preliminary

stage, to overcome their invocation of qualified immunity. The Bordens sufficiently allege the

violation by each of these defendants of a clearly defined constitutional right that was not objectively

reasonable under clearly defined law that existed at the time. Accordingly, the motion to dismiss the

§ 1983 claims against Garriques, Ganey, Graham, Conger, Pedone, Bain, Guidry-August, and

Holman is DENIED.

## C. Section 1983 Claims against Nehls, Kovar, and the County

The Bordens also assert § 1983 claims against the County and Nehls, Kovar, as supervisors

or policymakers, and the FBC Defendants move to dismiss these claims, asserting that they cannot

be held liable for the acts of others under the allegations set forth in the Bordens' first amended

complaint. Dkts. 7, 13. The court will fist outline the legal standard for holding a county or

supervisor liable for the acts of others under § 1983. Then, it will discuss the allegations in the

complaint relating to Nehls, Kovar, and the County, the FBC Defendants' arguments why the claims

should be dismissed, and the Bordens' arguments regarding why the court should allow them to

proceed with the claims. The court will then briefly discuss the relevant aspects of the main two

---

hours may have resulted in discomfort, [but] it was de minimis, and certainly not sufficiently serious to implicate [the plaintiff's] constitutional rights."); *Sherwin v. Camden City*, No. 16-cv-8665, 2018 WL 2383151, at *5 (D.N.J. May 24, 2018) ("Plaintiff has not offered any facts demonstrating how one day's denial of soap, toothpaste, or sanitary napkins jeopardized her health or caused her injuries. While the Court agrees that the lack of these items for a day is unpleasant or even embarrassing, this does not rise to the level of a constitutional violation. The Complaint does not plausibly suggest that conditions as Plaintiff describes them were imposed as 'punishment.'"); *Russo v. Cty. of Warren*, No. 1:12-CV-1616 (FJS/CFH), 2015 WL 7738043, at *8 (N.D.N.Y. Dec. 1, 2015) (agreeing that "[f]ailure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional challenge" but finding, at the summary judgment stage of an Eighth Amendment claim, that a denial of a change of clothes, use of sanitary napkins, a shower or towel for 48 hours did "not rise to the level of an unreasonable risk of serious damage to Plaintiff's health").

cases relied upon by the parties for their arguments, and determine whether the Bordens have plausibly stated § 1983 claims against Nehls, Kovar, and the County in light of these authorities.

### 1. Legal Standard

Section 1983 prohibits "persons" acting under the color of law from depriving another of any "rights, privileges, and immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. Municipalities and other local government units qualify as "persons" under § 1983. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 689, 98 S. Ct. 2018 (1978). However, a local government "may not be sued under §1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*; *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532 (5th Cir. 1996) ("If a § 1983 suit is brought against a [municipality or local government], the claim must be based upon the implementation or execution of a policy or custom which was officially adopted by that body's officers.") (citing *Krueger v. Reimer*, 66 F.3d 75, 76 (5th Cir. 1995)). "In order to hold a municipality or local government liable under Section 1983 for the misconduct of one if its employees, a plaintiff must initially allege that an official policy or custom 'was the cause in fact of the deprivation of rights inflicted,'" and the "description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)).

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). A "policymaker" must

have "'final policymaking authority' over the subject matter of the offending policy." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702 (1989). "There is no 'de facto' final policymaking authority." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). A "final policymaker" has "final authority to establish municipal policy with respect to the action ordered. . . . [Having] discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482, 106 S. Ct. 1292 (1986).

To meet the "official policy" element, the plaintiff must either allege (1) a written policy or procedure that is officially adopted or promulgated by the policymaking authorities of a governmental agency; or (2) a persistent, widespread practice of governmental agency officials or employees which, although not officially promulgated or adopted, is so common and well settled as to constitute a policy or custom that fairly represents the agency's policy. *Piotrowski*, 237 F.3d at 579. The plaintiff may also demonstrate an unwritten policy if he or she proves that a "final policymaker" took a single unconstitutional action. *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008).

To meet the "moving force" element, the plaintiff must show direct causation by establishing "'a direct causal link' between the policy and the violation." *Peterson*, 588 F.3d at 848. It is not enough for the plaintiff to allege that a change in policy may have prevented the violation, the municipality's policy "must be affirmatively linked to the constitutional violation." *Faire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992).

## 2. Allegations Regarding Nehls and Kovar

The Bordens allege that Nehls and Kovar both knew Tacoma Borden was at serious risk of harm of having seizures if not allowed to take her medication and recklessly disregarded this risk.

18

Dkt. 22 (citing paras. 47, 48 of the complaint). They contend that Nehls was the duly elected Sheriff of the County and a policymaker for the Fort Bend County Jail, and he approved the policies, practices, and customs at issue in their complaint. Dkt. 7. They allege that Kovar is the lieutenant in charge of the administrative function of the Fort Bend County Detention Division. *Id.* They assert that he, along with Nehls and designated sergeants, oversee budget and information systems, support and commissary, and medical and maintenance, and that Tacoma Borden suffered harm as a result of material failures from each of these groups. *Id.* They contend that these failures demonstrate that Tacoma Borden was harmed by systemic and institutional failures, not by a single employee's negligence or oversight. *Id.*

The Bordens specifically assert that the "policymakers failed to develop and institute adequate reality-based training programs relating to incarceration, care and treatment of individuals such as Mrs. Borden who has a pre-existing medical condition that affects her continence and causes involuntary seizures." *Id.* They further allege that the Nehls and Kovar (as well as Garza and John Doe) "were on notice of the obvious need to oversee, monitor, supervise, and train the jailers, nurses, physician assistants, and jail staff" about these issues. *Id.* They contend that Nehls and Kovar failed to adopt adequate hiring, training and supervisory policies to protect Tacoma Borden "from the unconstitutional conditions of confinement she was subjected to" and to "protect her from the harm that naturally follows when they, as supervisors, failed to train and supervise the subordinate jail and/or medical staff and officers who attended to Mrs. Borden." *Id.* They allege that the "replete failures to provide timely and adequate care for Mrs. Borden's imminent and obvious medical and basic needs . . . demonstrate . . . [the] policymakers' deliberate indifference to the need for adequate policies, training and supervision . . . and were the moving force behind the deprivation of [Tacoma Borden's] federally-protected rights." *Id.*

### 3. Allegations Regarding the County

With regard to the County, the Bordens contend that (1) the County failed to adopt policies providing medical care to inmates with imminent risk of medical emergency; (2) the County failed to adopt policies regarding medical care and minimal civilized measures of basic needs to inmates with medical conditions that affect the inmate's continence; and (3) the County failed to adopt adequate hiring, training, and supervising policies regarding treatment, handling, and accommodations of inmates with preexisting conditions causing incontinence. *Id.*

### 4. The FBC Defendants' Arguments

The FBC Defendants argue that the court should dismiss the § 1983 claims against Nehls, Kovar, and the County because the Bordens fail to allege facts that would entitle them to relief under § 1983. Dkt. 13. They argue that the Bordens do not allege sufficient facts to assert a claim for supervisor liability under § 1983 against Nehls and Kovar. *Id.* They assert that the Bordens' conclusory allegations do not rise to the requisite level of deliberate indifference. *Id.* (citing *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009)). With regard to the County, the FBC Defendants point out that a governmental entity cannot be held liable under § 1983 unless it has a policy or custom that violated the plaintiff's civil rights, and the plaintiff has the burden of proving that there was a constitutional deprivation and that municipal policy was the driving force behind the constitutional deprivation. *Id.* (citing *Monell*, 436 U.S. at 694). They contend that the complaint fails to identify any specific official policy, practice, or custom implemented by the County that was the moving force behind the alleged denial or delay or medical assistance. *Id.* They argue that the complaint instead only provides unsupported conclusions and conjecture. *Id.* They also argue that the complaint does not provide a specific policy and no allegations of fact that would connect specific policy flaws to a constitutional violation. *Id.* They argue that the complaint does not

sufficiently allege municipal liability for a custom having the force of an official policy because the allegations are conclusory and implausible on their face. *Id.* With regard to failure to train allegations, the County argues that Borden must allege that there is a pattern of similar violations by untrained employees, and her complaint only contains conclusory allegations that people have been injured or died because of the way the County conducts business. *Id.* And, they argue that the Bordens fail to adequately allege a violation for which the County could be held liable due to the conditions of confinement, as the condition must not be reasonably related to a legitimate goal, and here the suggestion that segregating wheel-chair-bound inmates is not reasonably related to a legitimate goal is implausible on its face. *Id.*

5.      **The Bordens' Arguments**

The Bordens argue that the County, Kovar, and Nehls are liable as policymakers who implemented facially unconstitutional policies and clarify that their challenge is to the conditions of confinement. Dkt. 22. They argue that the conditions of Tacoma Borden's confinement were not reasonably related to a legitimate government interest (citing *Bell v. Wolfish*), and they define the conditions as the policies, practices, or customs of restricting detainees with medical conditions diagnosed prior to arrival from receiving their prescribed medication. *Id.* They assert that the County does not provide training to employees for the treatment of detainees with preexisting medical conditions and routinely refuses to provide prescription medication to detainees at serious risk of harm. *Id.* With regard to the FBC Defendants' argument that the use of the wheelchair is reasonably related to a legitimate goal, they contend that the "crux of the Plaintiffs' claim against the Policymaker Defendants for the conditions of Borden's confinement does not hinge solely on Borden's dissatisfaction with being restricted to the disciplinary tank due to circumstances ultimately caused by Defendant's [sic.] policies, practices or customs." *Id.*

The Bordens further argue that at this stage of the case they are not required to provide the specific official policy, practice or custom that was the moving force behind the denial of medical assistance because there has been no discovery and they are thus not in a position to know the County's official policies. *Id.* (citing *Shepherd*, 591 F.3d at 453). They argue that they have pled sufficient facts for the court, viewing the complaint in a light most favorable to the plaintiffs, to reasonably infer that there may be a de facto policy implemented by the County's policymakers that leads to the unconstitutional treatment of detainees. *Id.*

### 6. Caselaw

In *Goodman*, upon which Defendants rely for their argument that the Bordens' allegations do not rise to a sufficient level of deliberate indifference, the estate of a bicyclist who assaulted a deputy constable after being advised that it was unsafe to ride a bike on the wrong side of the road, fled on his bicycle, was pursued by the deputy constable's dog, tried to drown the dog in standing roadside water, and then was shot by the deputy constable at close range after the deputy constable allegedly saw the bicyclist reaching for a shiny object in his pocket, sued Harris County, the deputy constable, and others. 571 F.3d at 392. The claims included a § 1983 claim against Harris County and Constable Ron Hickman for deliberate indifference to formulating policies and training programs for its deputy constables regarding the use of deadly force. *Id.* The district court dismissed these specific claims on summary judgment, and the estate appealed. *Id.* at 393.

The Fifth Circuit noted that in a failure to supervise or train claim under § 1983, "the plaintiff must show that: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Id.* (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)). "'For an official to act with deliberate

indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Smith*, 158 F.3d at 912). "To establish deliberate indifference, 'a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation.'" *Id.* (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)).

The Fifth Circuit found that the estate had not shown that Hickman acted with deliberate indifference as there was a policy on the use of deadly force and the estate "point[ed] to no pattern of violations or deficiencies in the training program." *Id.* at 396. Instead, the estate asserted that "some violations must have existed and these must have been due to a failure to train." *Id.* The Fifth Circuit agreed with the district court that this was insufficient to meet the plaintiff's burden at the summary judgment stage. *Id.*

As far as Harris County, the estate alleged that there was a deadly force policy in place, but Harris County had "no evidence that specialized training had been required or undertaken either for constables or canines." *Id.* The Fifth Circuit pointed out that it could not impose liability to a municipality absent a municipal policy or custom that caused the injury and absent a "'deliberate choice to follow a course of action . . . from among various alternatives to city policymakers.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197 (1989)). Rather, "'[o]nly where a failure to train reflects a "deliberate" or "conscious" choice by a municipality . . . can a city be liable for such a failure under § 1983.'" *Id.* (citing *City of Canton*, 489 U.S. at 389). The Fifth Circuit found that the estate failed to point to a policy or custom that led to the bicyclist's death, failed to set forth any intentional choice made by Harris County, and thus showed no deliberate indifference to the need for policies and training. *Id.* at 396. The estate had alleged that the policies

may not have been followed, but the district court and Fifth Circuit both, again, determined this was not enough. *Id.*

In the *Shepherd* decision, which the Bordens cite for their contention that they have pled enough at this stage and do not have to plead a specific policy, the plaintiff alleged in his complaint that the "jail's system of providing medical care to inmates with chronic illness," including its "evaluation, monitoring, and treatment" of these inmates, was "grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel." 591 F.3d at 453. The court considered this pleading as well as additional evidence of treatment of other inmates with chronic illness at the summary judgment stage, which the Fifth Circuit determined was sufficient for the court to "reasonably infer a *de facto* policy of failing properly to treat inmates with chronic illness." *Id.*

### 7.    Analysis  - County

Here, of course, it is the motion to dismiss stage, and the Bordens do not have the evidence of how other inmates have been treated that would be available at the summary judgment stage. The Bordens point out, however, that their pleading alleges that the County does not provide training to employees for the treatment of detainees with preexisting medical conditions, routinely refuses to provide prescription medication to detainees at serious risk of harm, and instructs staff to ignore requests for medical assistance. *Id.* They further allege that the County's policies, procedures, and customs create grossly unsanitary, inhumane, and dangerous conditions of confinement for detained individuals, and specifically point to the routine refusal to provide prescription medication to detainees at serious risk of harm and placing them in the disciplinary tank with accompanying restrictions simply due to their disabilities. *Id.* The court finds that these allegations are sufficient

at the pre-discovery stage to allege a § 1983 claim against the County. The motion to dismiss the § 1983 claim against the County is therefore DENIED.

### 8. Analysis - Nehls and Kovar

While the Bordens assert that Nehls and Kovar were policymakers, they do not seem to allege that Nehls or Kovar had final policymaking authority. However, they do make sufficient allegations of failure to train under the test set forth in *Goodman*. Both Nehls and Kovar are alleged to be supervisors who did not adequately train jail personnel regarding individuals with preexisting medical conditions who needed medication, and, according to the amended complaint, these inadequately trained employees did not provide Tacoma Borden with her medication or with basic sanitary supplies, which caused her harm and led to unconstitutional conditions of confinement. Additionally, the Bordens adequately allege that Nehls and Kovar were deliberately indifferent to these issues. These are not, as the FBC Defendants argue, merely conclusory allegations. Rather, they are exactly the type of allegations that one would expect at the pre-discovery stage. Accordingly, the FBC Defendants' motion to dismiss the claims against Nehls and Kovar is DENIED.

## D. The ADA Claim

The Bordens assert a claim under the Americans with Disabilities Act ("ADA") against the County, Nehls, Kovar, all of the other FBC Defendants (except James), and policymakers John Does and jailer John Does. Dkt. 7. They contend that all of these defendants discriminated and retaliated against Tacoma Borden on the basis of her medical disability. *Id.*

The FBC Defendants move to dismiss the ADA claims, arguing that the Bordens fail to provide a plausible allegation of disparate treatment due to Tacoma Borden's alleged disability. Dkt. 13. They contend that any allegations of discrimination in the amended complaint are

conclusory. *Id.* They additionally argue that to the extent the Bordens are alleging failure to accommodate, they have failed to include any factual allegations that the FBC Defendants were deliberately indifferent to Borden's medical conditions. *Id.* Finally, they argue that the ADA does not provide a private right of action for substandard medical treatment. *Id.* The Bordens assert that the amended complaint sufficiently alleges a prima facie case for disability discrimination and that they have listed several reasonable accommodations that should have been provided to Tacoma Borden. Dkt. 22.

Under Title II of the ADA, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity" includes state or local governments, "any department, agency, special purpose district, or other instrumentality of a State or States or local government," and the National Railroad Passenger Corporation (and any commuter authority). 42 U.S.C. § 12131. Courts in this district have interpreted this to mean that the statute does not apply to officials sued in their individual capacities, particularly since the Fifth Circuit has interpreted similar language in the Rehabilitation Act to preclude suit against officials in their individual capacities. *See Eustice v. Tex. A&M Univ.*, No. 4:15-CV-03180, 2016 WL 8710444, at *8 (S.D. Tex. Sept. 30, 2016) (Harmon, J.) (collecting Circuit Court cases) ("[C]ourts have concluded that individuals sued only in their individual capacities cannot be considered proper defendants under either Title II of the ADA or the [Rehabilitation Act]."); *Navarette v. Isbell*, No. H-13-2678, 2015 WL 926559, at *3 (S.D. Tex. Mar. 4, 2015) (Atlas, J.) (collecting cases) ("It is well established that individuals cannot be sued under the ADA in their individual capacities."); *Estate of A.R. v. Grier*, No. H-10-0533, 2011 WL 3813253, at * 7 (S.D. Tex. Aug. 26, 2011) (Rosenthal, J.) ("The ADA and Rehabilitation Act do not

provide for damages against individuals."); *DeLeon v. City of Alvin Police Dep't*, No. H-09-1022, 2009 WL 3762688, at *3 (S.D. Tex. Nov. 9, 2009) (Hoyt, J.); *Gonzales v. City of Corpus Christi*, No. C.A. C-05-280, 2006 WL 1517507, at *5 (S.D. Tex. May 31, 2006) (Jack, J.); *see also Lollar v. Baker*, 196 F.3d 603 (5th Cir. 1999) (interpreting the Rehabilitation Act). A plaintiff states a claim against a public entity under Title II of the ADA if the plaintiff alleges " (1) that he [or she] has a qualifying disability; (2) that he [or she] is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his [or her] disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

Defendants do not argue that Tacoma Borden did not have a qualifying disability under the ADA. Instead, they contend that she only makes conclusory assertions of discrimination and conclusory assertions that the defendants were deliberately indifferent to Tacoma Borden's medical conditions. *Id*. Additionally, they argue that to the extent her allegations are based on inadequate medical care, they fail as a matter of law. *Id*.

The Bordens point out that they allege that Tacoma Borden is an epileptic who suffers from severe seizures if she does not take her medication and that she so informed the defendants yet they did not provide the medication for several days, resulting in multiple seizures and a stroke that caused Tacoma Borden to not be able to walk. Dkt. 22. They argue that they alleged a list of several reasonable accommodations that should have been provided but were instead denied or delayed, and point out that she was housed in a disciplinary tank due to her disability that caused her to be denied equal access to clean clothes, feminine hygiene products, commissary, and the privilege of showering before 12 a.m. *Id*. They also allege that Tacoma Borden was denied adequate medical care, that her

complaints about her serious medical condition were not taken seriously, and that the defendants denied her requests for medication even after she had multiple seizures. *Id.*

The court finds that the Bordens' allegations are sufficient to state a claim against the County under the ADA. They allege more than inadequate medical care—Tacoma Borden claims she was placed in a disciplinary cell solely due to her disability and thus treated differently than inmates who are not disabled. The motion to dismiss the ADA claims against the County is DENIED. The motion to dismiss the ADA claims against the defendants sued in their individual capacities is GRANTED.

### E.     Immunity Regarding State Law Claims

The Bordens also assert common law claims under Texas law for loss of services, loss of consortium, companionship, and society, and retaliation. Dkt. 7. The FBC Defendants argue that governmental immunity bars these claims against both the County and the FBC County Individual Defendants because the State of Texas has not waived its immunity from suit for these types of claims. Dkt. 13. The Bordens do not respond to this argument. Dkt. 22. "[U]nder the common-law doctrine of sovereign immunity, a municipality is immune from tort liability for its own acts or the acts of its agents unless the Texas Tort Claims Act [("TTCA")] waives immunity." *City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998). The Bordens do not argue that any waiver applies and do not argue that their tort claims against the Individual FBC Defendants should survive. Accordingly, the motion to dismiss the state-law claims is GRANTED.

### F.     Damages

The Bordens seek punitive damages in the first amended complaint. Dkt. 7. The FBC Defendants argue that the County is exempt from punitive damages under the TTCA and under federal law. Dkt. 13. The Bordens do not respond to this argument either. *See* Dkt. 22. Under

Texas Civil Practices and Remedies Code section 101.024, even if tort claims were allowed in this case, exemplary damages are not. Tex. Civ. Prac. & Remedies Code § 101.024. Similarly, "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts Inc.*, 453 U.S. 247, 271, 101 S. Ct. 2748 (1981). They are also unavailable in suits brought against a municipality under § 202 of the ADA. *Barnes v. Gorman*, 536 U.S. 181, 190, 122 S. Ct. 2097 (2002). According, the FBC Defendants' motion to dismiss the claim for punitive damages against the County is GRANTED.

## IV. LEGAL ANALYSIS-MORE DEFINITE STATEMENT

The FBC Defendants move, in the alternative, for a more definite statement under Rule 12(e). Dkt. 12. However, none of the claims that the court has found are viable are vague or ambiguous. The motion for a more definite statement is therefore DENIED.

## V. CONCLUSION

The FBC Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART. It is GRANTED with respect to the following:

(1) the Fifth Amendment claims against all of the FBC Defendants;

(2) the § 1983 claim against James;

(3) the ADA claim against the Individual FBC Defendants;

(4) the state-law claims against all of the FBC Defendants; and

(5) the punitive damages claims against all of the FBC Defendants.

The FBC Defendants' motion to dismiss is otherwise DENIED.

The FBC Defendants' alternative motion for a more definite statement is also DENIED.

Signed at Houston, Texas on November 27, 2019.

_____
Gray H. Miller
Senior United States District Judge